**Ernest S. SIWIK, Plaintiff,**

v.

**MARSHALL FIELD & COMPANY, Defendant.**

**No. 95 C 6025.**

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 2, 1996.

---

Herbert H. Victor, Chicago, IL, for Plaintiff.

Robert J. Mignin, Staci A. Stobart,. Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Ernest Siwik ("Siwik") has sued Marshall Field & Company ("Marshall Field"), asserting that his employment was terminated in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–624, and Labor Management Relations Act of 1947 § 301, 29 U.S.C. § 185 ("Section 301"). Marshall Field now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. Marshall Field and Siwik have respectively complied with this District Court's General Rule ("GR") 12(M) and 12(N),[1] and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Marshall Field's motion is granted in part and denied in part.

*Summary Judgment Standards*

Familiar Rule 56 principles impose on Marshall Field the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to Siwik (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.,* 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Siwik was treated in a statutorily prohibited discriminatory fashion (*Kirk v. Federal Property Mgmt. Corp.,* 22 F.3d 135, 138 (7th Cir.1994)).

As with every summary judgment motion, this Court accepts nonmovant Siwik's version of any disputed facts. What follows, then, is a version of the material facts culled from the parties' submissions, with any differences being resolved in Siwik's favor.

*Facts*

As part of its facilities, Marshall Field operates a merchandise distribution center ("Center") in Chicago. At the time of all events at issue, Siwik—who had been employed by Marshall Field since January 19, 1965—worked at the Center as a shipping and receiving clerk. Under a collective bargaining agreement effective from April 10,

---

1. This District Court has designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts. Then GR 12(N) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Where Siwik has either explicitly or implicitly admitted an assertion in Marshall Field's GR 12(M) submission, that will be indicated by a citation to his GR 12(N) response ("S.12(N)—"), though the admitted assertion itself is found in the GR 12(M) statement.

1992 to June 15, 1996 ("Agreement"), Local 25 of the Service Employees International Union ("Union") represented the bargaining unit that included Siwik's job. Siwik was a Union member and he had served as a Union steward at the Center from 1981 to 1988 (S.12(N) ¶¶ 5–11).

In October 1994 Marion Mocarski ("Mocarski") worked with Siwik as a shipping and receiving clerk at the Center. Between 7:30 and 9 a.m. on October 5 Mocarski approached Siwik while he was at work unloading trailers for several warehouse dock lanes and "started fucking around," interfering with Siwik's work (Siwik Dep. Ex. 5[2]). Although no previous instances of hostility had occurred between the two, Siwik asserts that Mocarski was the unprovoked aggressor (Complaint ¶ 14; Siwik Dep. Ex. 5). For his part Mocarski reported in his loss prevention statement that Siwik attempted to hit him with a pipe during that initial encounter (Clash Aff. ¶ 13). Siwik claims that Mocarski's teasing and harassment continued throughout the morning, but no further physical confrontation occurred in the warehouse dock lanes (Complaint ¶ 15).

Later that same morning, between approximately 10 and 10:15 a.m., Siwik and Mocarski took a scheduled break in the Center employees' cafeteria. During the break Mocarski approached Siwik and requested an apology for the morning's incident (Siwik Dep. Ex. 5; Clash Aff. ¶ 13). Siwik repeatedly refused (Clash Aff. ¶ 13), and a 10 to 15 minute fight ensued (S.12(N) ¶ 16). After the fight both Siwik and Mocarski were escorted by a security officer to the Center's Loss Prevention Office (S.12(N) ¶ 18). Neither employee denied that he had been fighting, though each blamed the other for starting the fight (S.12(N) ¶ 19). Siwik alleges that the fight began when Mocarski spit water in his face (Complaint ¶ 19). Mocarski reported that the fight began when Siwik hit him in the jaw (Clash Aff. ¶ 13). Because it was undisputed that they had been involved in a fight, Marshall Field suspended both of them pending further investigation (S.12(N) ¶ 20).

Center's Manager of Employee and Labor Relations Edwin Clash ("Clash") conducted an investigation of the October 5 incident and learned that no supervisor had been present to witness the fight (S.12(N) ¶ 26). Two hourly co-workers of Siwik and Mocarski who had been in the cafeteria at the time—Guy Altobelli ("Altobelli") and Gilbert Moreno ("Moreno"), both Union members—refused to provide Clash with any information (S.12(N) ¶¶ 27, 38). Unable to determine whether either employee had acted in self-defense, Clash conferred with Marshall Field's Director of Associate and Employee Labor Relations Paul Strickland ("Strickland") and its Manager of Labor Relations Henry Bechard ("Bechard") as to the investigation and the discipline to be imposed on Siwik and Mocarski. Clash, Bechard and Strickland decided to discharge both employees (S.12(N) ¶¶ 28–29).

Everyone agrees that on October 6 Clash telephoned Mocarski and Siwik separately and informed them that Marshall Field "did not tolerate violence in the workplace and had, therefore, discharged them both" (S.12(N) ¶ 30). But Siwik swears that in a separate (presumably earlier) telephone call that Clash initiated on that same day, he provided Siwik with a different explanation for the impending termination. First Clash reported that Bechard and not Clash would soon be firing Siwik (Siwik Dep. 142). Next

---

**2.** What has just been set out in the text does not really qualify for consideration under Rule 56, for Dep. Ex. 5—Siwik's handwritten report to Marshall Field's Loss Prevention Department—is hearsay, inadmissible for the truth of what is said there. In that and several other respects Siwik's counsel has not done what is required to get Siwik's version of events credited for present purposes. Thus despite the express warning of Rule 56(e) that "an adverse party [in this instance Siwik] may not rest upon the mere allegations ... of the adverse party's pleading," Siwik has failed to tender admissible evidence supporting his story that Mocarski was the initiator and aggressor in the altercation between the two. Nonetheless the account in the text will accord Siwik more than his due (for example, by citing to his Complaint's allegations even where they are denied by Marshall Field) just to confirm the limited survival of Siwik's claims under the most favorable possible scenario. This warning applies wherever "Dep. Ex. 5" or "Complaint ¶ —" appears in the text in support of a supposedly factual statement.

Clash said that Siwik's age, and not the fight, was the true reason for his termination (*id.*):

> [Clash] told me that I wasn't being—I was not being fired for fighting, that I was being fired because I am over 40 years old and that they are hiring employees with lesser, with lower age and that at lesser pay because they can get two people to do the same amount of work that I do at the minimum wage, four twenty-five an hour, and that I am not being fired for fighting, and that they go to work and they get a tax break for hiring minorities. They get a tax break of some kind, see. But I wasn't being fired for fighting. I was being fired because I was over 40 years old.

For any Marshall Field employee within the bargaining unit who was subjected to any disciplinary measure (including firing, of course), the Agreement made a three-step grievance procedure available to review the employer's decision. If any such grievance was not resolved to Union's satisfaction in those proceedings, Union had a further option of requesting binding arbitration (Siwik Dep. Ex. 1).

On this occasion Union Staff Representative Willie Harris ("Harris") filed separate grievances on behalf of both Siwik and Mocarski after their discharges. On October 27, 1994 Marshall Field and Union conducted the third step of the Agreement's grievance procedure for both employees. On November 10 Marshall Field sent a letter notifying Union of its decision to deny both grievances and to uphold the Siwik and Mocarski firings (S.12(N) ¶¶ 31–32, 34, 36). Siwik submits nothing to suggest that he ever told anyone about Clash's explanation for his termination during any stage of the grievance process, and Marshall Field's statement that he did not do so (not itself evidence, but a representation made at its Mem. 4 n. 2) has gone unchallenged by Siwik.

Union had conducted its own investigation of the incident before it pursued the grievance procedure. During that investigation Harris separately interviewed Altobelli and Moreno, the shipping and receiving clerks (and Union members) who had witnessed parts of the fight but who had refused to discuss it with Clash (S.12(N) ¶ 38; Harris Dep. 43). Both Altobelli and Moreno told Harris that Siwik had started the fight and that Mocarski had simply attempted to defend himself (S.12(N) ¶ 38). After discussing the matter with Union's attorney David Mathews ("Mathews"), Harris telephoned Clash in January 1995 to tell him (for the first time) of Union's independent investigation. Harris offered to withdraw Union's request to arbitrate Siwik's discharge if the company would reinstate Mocarski (S.12(N) ¶ 39–40).

Clash then spoke with Bechard and Strickland about the new information supplied by Union, and the three decided that Mocarski should be reinstated in accordance with Marshall Field's policy of not discharging employees who fought "solely in self-defense" (S.12(N) ¶ 41; Clash Aff. ¶ 11). Union sent a January 13, 1995 letter withdrawing its request to arbitrate Siwik's grievance, and on February 6 Marshall Field reinstated Mocarski following a four-month suspension without pay. Siwik remained terminated (S.12(N) ¶¶ 42–43).

Also on January 13, 1995, Siwik received a copy of a letter from Mathews to Harris explaining Mathews' recommendation not to arbitrate Siwik's grievance due to Siwik's role as aggressor in the altercation (S.12(N) ¶¶ 44–45). On that same day Siwik telephoned Harris to ask whether Union would overrule Mathews and take the case to arbitration. Harris told Siwik unequivocally that Union would not do so (S.12(N) ¶¶ 46). Siwik did not communicate with anyone else at the Union and took no further action to pursue his grievance (S.12(N) ¶ 47).

On May 10, 1995 Siwik filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). On July 25 EEOC issued Siwik a right-to-sue letter. On October 20 Siwik filed the timely Complaint here (S.12(N) ¶¶ 48–49).

### Count I: ADEA Claim

To succeed in his ADEA claim, Siwik must prove[3] "that he would not have been dis-

---

**3.** To defeat the present motion, Siwik need not of course "prove" anything. Instead his burden is

charged 'but for' his employer's motive to discriminate against him because of his age" (*Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 840 (7th Cir.1996), quoting *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991)). There are now two essentially different frameworks though which an employee may prove his claim. One is the mixed-motives analysis announced in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794–95, 104 L.Ed.2d 268 (1989), appropriate when both legitimate and illegitimate considerations play material roles in an adverse employment decision. By contrast, the familiar ping-pong approach dictated by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), as rearticulated in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), is appropriate when "*either* a legitimate *or* an illegitimate set of considerations led to the challenged decision" (*Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1789 (emphasis in original)).

It should be noted at the outset that although *Price Waterhouse, McDonnell Douglas* and *Burdine* are all Title VII cases, their principles have been held applicable to ADEA cases as well (*Visser v. Packer Eng'g Assocs., Inc.,* 924 F.2d 655, 658 (7th Cir.1991) (en banc)). Since then some uncertainty has been injected into the analysis by enactment of the Civil Rights Act of 1991 ("Act"), which partially overruled the application of *Price Waterhouse* to Title VII cases, so that in such cases an employer can now limit only the employee's remedy—rather than defeating liability outright—by showing that it would have made the same termination decision regardless of any demonstrated discriminatory motive (42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B)).

By its very terms, however, the Act applies only to cases where "race, color, religion, sex, or national origin" is the motivating factor for an employment decision, not to a case under ADEA (42 U.S.C. § 2000e–2(m)). Both because ADEA has not been similarly amended and because both parties to this litigation call upon the *Price Waterhouse* approach, it will be assumed for present purposes that the Act does not affect the analysis. To the same effect *Doll v. Brown,* 75 F.3d 1200, 1203 (7th Cir.1996) (citations omitted) has said:

> Congress has amended Title VII to convert mixed-motive cases to no-injury cases, but we may assume, without having to decide, that the *Price Waterhouse* approach survives in other types of discrimination cases.

On that premise, if an employee makes an appropriate showing of age discrimination *Price Waterhouse* comes into play immediately—for if the employee can sustain his or her initial burden of persuasion on that score, that burden shifts to the employer and the employee need not rebut the employer's claim in the first instance. On the other hand, the "entire purpose" of the *McDonnell Douglas–Burdine* framework "is to compensate for the fact that direct evidence of intentional discrimination is hard to come by" (*Price Waterhouse,* 490 U.S. at 271, 109 S.Ct. at 1802 (O'Connor, J., concurring)). Hence that ping-pong approach is normally triggered by an employee's lack of direct evidence (or its equivalent, circumstantial evidence that creates the inference of intentional discrimination—see *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994))—and in that event the employee sustains the burden of persuasion throughout.[4]

What that means in the context of summary judgment motions in a case such as this one, where the employee proffers some evidence of age discrimination, is that this Court should first determine whether there is any genuine issue of material fact under the mixed-motives analysis of *Price Water-*

---

the already-stated lesser one of posing a genuine issue of material fact. Although this opinion may employ the language of proof (or comparable locutions) because the case law does so, this Court's analysis has adhered to the less demanding Rule 56 requirement throughout.

4. That burden should not be confused with the burden of production (often termed the "burden of going forward"), which does shift and re-shift in the *McDonnell Douglas–Burdine* analysis.

*house.* If the evidence suffices to survive a motion for summary judgment, there is no need to indulge the burden-shifting *McDonnell Douglas* analysis—as *TWA v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985) says:

> [T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. Accord, *Randle v. LaSalle Telecomms., Inc.,* 876 F.2d 563, 569 (7th Cir.1989).

### Price Waterhouse Direct Method

*Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794–95 (adapted to the ADEA context) describes the route to be traveled in an employment discrimination case when the employee offers the requisite evidence of discrimination:

> [W]e hold that when a plaintiff in [an ADEA] case proves that [his age] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [age] into account.

In other words, where it appears that the employer had mixed motives, one legitimate and one illegitimate, the ultimate burden shifts to the employer to prove that its decision would have been the same without the illegitimate motive.

As for the employee's initial burden in a mixed-motives case, the plurality opinion in *Price Waterhouse, id.* at 250, 109 S.Ct. at 1790–91 (again adapted to speak in ADEA terms) elaborates:

> In saying that [age] played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was [over age 40].

But that four-Justice statement needed the concurrence of Justice O'Connor or Justice White or both to form a majority decision. Hence the term "motivating part" must be read as requiring the unlawful motive to have been a *substantial* factor, not just a factor, in the adverse decision (*id.* at 265, 109 S.Ct. at 1798–99 (O'Connor, J., concurring); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring)). *Visser,* 924 F.2d at 658 restates the *Price Waterhouse* test this way:

> However, once the plaintiff in a civil rights case has shown that a forbidden purpose was a substantial factor in the decision to fire him, the burden shifts to the employer to persuade the court that the plaintiff would have been fired anyway, even if that purpose had not existed.

Siwik offers only one piece of material evidence that Marshall Field intentionally (and impermissibly) took his age into account (indeed, was motivated by his age alone) in making the decision to fire him. But that item is the proverbial "smoking gun" evidence that is so rare in ADEA litigation (*Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994)). As stated earlier, Siwik testified that Clash told him "I wasn't being fired for fighting. I was being fired because I was over 40 years old" (Siwik Dep. 142). Although Marshall Field identifies some reasons why a trier of fact might find that suspect,[5] Siwik's sworn testimony must be accepted as true at this point. Hence Siwik has at a minimum satisfied his *Price Waterhouse* burden of showing that his age was a "substantial factor" in the decision to terminate him.

That being true, if *Price Waterhouse* analysis were to apply (a subject discussed a bit later) the burden of persuasion would shift to Marshall Field. It would have to demonstrate—sufficiently to override all reasonable pro-Siwik inferences—that "it would have made the same decision even if it had not taken the plaintiff's [age] into account" (*Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1795). As noted in *Adler v. Madigan,* 939 F.2d 476, 479 (7th Cir.1991), " '[m]ixed mo-

---

5. On that score Marshall Field points to the absence of corroboration for Siwik's assertion, as well as to the contrary evidence provided by Clash (Clash Aff. ¶ 10) and Harris (Harris Dep. 15). And as stated in the *Facts* section, it ap-

pears that Siwik never identified Clash's asserted age-biased statement either during the Union grievance procedure or during Siwik's personal conversations with Harris.

tives' situations are ordinarily not grist for the summary judgment mill," for such cases are typically bound up in the fact-intensive and credibility-intensive questions of motive and intent (*Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994)).

Marshall Field Mem. 6 proffers as a claimed legitimate, nondiscriminatory basis for its termination of Siwik a "well-known and consistently-applied policy that fighting at work results in discharge unless an employee can prove that he was acting solely in self-defense." To establish the existence of such a policy, Marshall Field cites a number of record references. First its Associate Handbook, with which Union workers are quite familiar (Harris Dep. 17), provides that "[f]ighting, threats, intimidation, harassment or physical abuse of customers or associates" "may result in immediate termination" (Siwik Dep. Ex. 7 at 12). And Clash testified that the Handbook policy is enforced without exception—just as an employee would be immediately terminated for theft, "[Marshall Field's] policy is that if you fight in a building in a physical way, we release you" (Clash Dep. 34). Center's Union Representative Harris similarly emphasized that since Marshall Field's acquisition by Dayton–Hudson Corporation the firm has enforced a "no tolerance policy" toward employee fighting (Harris Dep. 16):

> [R]ecently since [Marshall Field was] purchased by Dayton–Hudson Corporation, they have this no tolerance policy in those areas as far as drinking on the job and fighting on the job. We do have in our collective bargaining agreement, our union contract that those issues which [are] written into the contract that I just mentioned are grounds for immediate termination.

Finally, Clash confirmed the "one exception" to the no-tolerance rule "when there is evidence that one employee was the aggressor and the other employee acted solely in self-defense" (Clash Aff. ¶ 7). To illustrate that "aggressor rule," Marshall Field identifies an October 1991 fighting incident in which an initial determination to discharge both employees was reversed—a 47-year-old employee was reinstated upon evidence that he acted solely in self-defense to an attack by a 38-year-old employee (S.12(N) ¶ 23; Clash Aff. ¶ 8).

How does that evidence play out under the *Price Waterhouse* formulation? It will be recalled that *Price Waterhouse* shifts the burden of persuasion to the employer where there are *two* factors that led to the adverse employment decision, one factor prohibited by law and the other factor legitimate. But in this instance, if Siwik is to be believed (as he must be for present purposes), only *one* factor—an illegitimate one—caused his firing: Clash told Siwik in no uncertain terms that he was being fired "because" he was over 40 years old and not because of fighting (Siwik Dep. 142). And that being so, even if Marshall Field could establish a consistently applied no-tolerance-of-fighting policy it would seem that its pointing to that policy *in Siwik's case* could fairly be viewed by a factfinder as pretextual—as a coverup for its real age-discriminatory reason as admitted by Clash.[6]

Neither side has looked at the matter from that perspective, so that understandably neither side has tendered any authority that speaks to the just-posed conundrum. Indeed, Marshall Field's R. Mem. 4 urges only that "the burden [has] shifted to Plaintiff to provide evidence to cast doubt" on the company's adherence to its no-fighting policy— an argument that is mistaken even under *Price Waterhouse* analysis, given the credence that must be attached to Siwik's testi-

---

**6.** That situation would appear conceptually similar to the after-acquired-evidence situation, in which an employer may be held liable for a discriminatorily-motivated firing even though it shows that it would have made the same decision for a different—and quite legitimate—reason (in that area the definitive decision is *McKennon v. Nashville Banner Publishingg Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995)). In such a situation, because "an unlawful motive was the sole basis for the firing" (*id.* 513 U.S. at ——,

115 S.Ct. at 885), "[m]ixed motive cases are inapplicable" (*id.*) There would seem to be no principled distinction between (1) an impermissible decision that would have been made anyway if the employer had known of the existence of a permissible reason for the same decision and (2) a decision that was made solely for an impermissible reason even though the employer already knew of a permissible reason for the same decision, but it didn't act on that permissible reason.

mony and the principle that he need only demonstrate a genuine and material factual issue to stave off summary judgment. For its part, this Court has located no authorities that address the matter in the terms outlined here—something that is hardly surprising, given the already-described highly unusual factual scenario that must be accepted as true on the present motion.

As it turns out, though, there is no need to set sail on such a wholly uncharted sea. This is so because there is enough record evidence to create an issue of material fact as to the uniformity with which Marshall Field is claimed to apply a no-fighting policy. It will be recalled that Marshall Field's Associate Handbook provides only that an employee "may" be terminated for fighting on the job (Siwik Dep. Ex. 7 at 12). In fact, the ultimate decision to terminate a fighting employee may be far more discretionary than Clash's "no tolerance" label would connote.

Indeed, contrary to the suggestion in Harris' quoted testimony, Union apparently discovered during its independent investigation of the October 5, 1994 fight that not all cases of fighting result in termination. Mathews' January 13, 1995 letter to Harris recommending that Union not seek arbitration on Siwik's grievance said in part (Siwik Dep. Ex. 8):

> Although instances can De found in which an employee who was the aggressor in a fight was not discharged, the general rule is summary discharge for the aggressor.

Mathews' letter does not specify the basis for that negation of any ironclad rule, but other evidence shows that he personally investigated Siwik's grievance and that he "might" have spoken directly to Union members (and Center employees) Altobelli and Marino (Siwik Dep. Ex. 8; Harris Dep. 72). Whether such other fighting episodes that did not result in termination occurred before or after the Dayton Hudson acquisition—the supposed bright line of "no tolerance" that Marshall Field attempts to draw—is unclear, but Mathews' January 1995 finding of the exercise of discretion by Marshall Field's management in such situations creates a factual issue (at the very least) as to the consistent enforcement of the no-fighting policy.

■ In sum, whether the *Price Waterhouse* approach is applied or is prescinded, a genuine issue of material fact exists as to whether Siwik would have been discharged absent Marshall Field's age discrimination. A fortior there is no need to evaluate Siwik's arguments as to the indirect burden-shifting method of *McDonnell Douglas,* for sufficient evidence of age bias has been presented to survive Marshall Field's motion for summary judgment. Summary judgment on Siwik's ADEA claim is inappropriate and is denied.

### Counts II and III: Siwik's Section 301 Claims

■ Counts II and III of Siwik's Complaint advance "hybrid" claims that seek to invoke Section 301. Ever since *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) it has been well-settled that a six-month limitations period applies to such hybrid claims (see, e.g., *Pantoja v. Holland Motor Express, Inc.,* 965 F.2d 323, 326–27 (7th Cir.1992)). That six-month period "begins to run 'from the time a final decision on the employee's grievance has been made or from the time the employee discovers, or in the exercise of reasonable diligence should have discovered, that no further action would be taken on his grievance'" (*Adams v. Budd Co.,* 846 F.2d 428, 431 (7th Cir.1988)). Notice to an employee that his union will not pursue a grievance any further starts the time clock ticking (*Martin v. Youngstown Sheet & Tube Co.,* 911 F.2d 1239, 1246 (7th Cir.1990)).

■ In those terms Siwik's Section 301 claims are clearly untimely. It will be recalled that on January 13, 1995 Siwik received a copy of the letter from Mathews to Harris recommending that Union not seek arbitration on Siwik's claim (S.12(N) ¶¶ 44–45; Siwik Dep. Ex. 8). On that same day Siwik was informed "unequivocally" by Harris that Union would not take his case to arbitration (S.12(N) ¶ 46). Yet Siwik did not file his Section 301 claim until October 25, 1995, well after six months had elapsed.

If then Marshall Field had set up the statute of limitations as an affirmative defense in its Answer, summary judgment on

Counts II and III would unquestionably be in order. But it did not do so, and Siwik therefore argues that Marshall Field has waived that defense.[7]

■ In that respect Rule 8(c) specifies that a defendant "shall" set forth the statute of limitations "and any other matter constituting an ... affirmative defense" in its answer to the complaint. By negative inference, a defendant's omission of an affirmative defense from the answer is generally treated as a waiver (or forfeiture) of that defense (*Coleman v. Ramada Hotel Operating Co.,* 933 F.2d 470, 475 (7th Cir.1991)).

In this instance, however, no potentially mandatory reading of Rule 8(c) and of that negative inference are in order in any event. Marshall Field's R. Mem. 12 demonstrates that it had no knowledge of the untimeliness of Siwik's Section 301 claims when its Answer was filed—it did not learn that until months later, when it took Siwik's deposition on April 12, 1996. At that point he acknowledged for the first time the unequivocal and early notification that he had received from Harris that Union would not seek arbitration (*id.;* Siwik Dep. 182). On July 25, 1996—just three months later and just one month after the deposition of Harris (the last deposition in this record) was taken—marshall Field filed its motion for summary judgment.

Under these circumstances it is unnecessary to resolve the tension that can exist between a strict application of Rule 8(c) and the more relaxed and nonreflexive approach that is exemplified in the statement that "[t]he waiver practice is not unreasonable or arbitrary" (5A Charles Wright & Arthur Miller, *Federal Practice & Procedure: Civil 2d* ("Wright & Miller") § 1394 at 730 (2d ed.1990)). Under the latter view, if an allegedly-waived affirmative defense is not one of the seven defenses mentioned expressly in Rule 12(h)—and the statute of limitations is

not—the waiver question turns on the more flexible balancing of Rule 15 (*Giotis v. Apollo of the Ozarks, Inc.,* 800 F.2d 660, 664 (7th Cir.1986)).

Rule 15(a) provides that after a responsive pleading has been filed or where no responsive pleading is permitted, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." For over three decades the definitive reading of that provision has been as taught in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (citations omitted):

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

■ To be sure, Marshall Field has not literally sought leave to amend under Rule 15(a). But where the situation would otherwise permit an amended answer (especially in the absence of prejudice), unpleaded affirmative defenses may be asserted by pretrial motion rather than by the formal invocation of Rule 15(a) (5 Wright & Miller § 1278, at 494; *Blaney v. United States,* 34 F.3d 509, 512 (7th Cir.1994); *MCI Telecomm. Corp. v. Ameri–Tel, Inc.,* 881 F.Supp. 1149, 1158 n. 21 (N.D.Ill.1995)).

---

7. Siwik's contention is really one of forfeiture rather than waiver. This was after all not a situation of the voluntary relinquishment of a known right—see, albeit in the different context of the Federal Rules of Criminal Procedure, such cases contrasting the concepts of waiver and forfeiture as *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993):

> Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right."

Accord, *United States v. Ottersburg,* 76 F.3d 137, 138 (7th Cir.1996).

On balance, and particularly in light of the brief interval between the post-Answer date on which Marshall Field learned of the potential limitations defense and the time of its filing the current motion,[8] this Court opts for the more generous Rule 15(a)-type approach rather than for a strict application of Rule 8(c) (which, it is worth repeating, does not literally apply here either).[9] There is no record evidence of bad faith on the part of Marshall Field, nor any suggestion of prejudice to Siwik. It has already been said that the statute of limitations on Siwik's Section 301 claims began to run on January 13, 1995 but that Siwik did not file suit until more than nine months had elapsed thereafter. Thus the claims were plainly out of time in terms of the six-month limitations period announced in *DelCostello,* and that calls for the summary dismissal of Counts II and III of Siwik's Complaint.

*Conclusion*

Siwik has provided enough evidence of age animus in Marshall Field's decision to terminate his employment to survive the current motion. At a minimum a genuine issue of material fact exists as to whether Siwik would have been discharged had it not been for his age. As to Complaint Count I, then, Marshall Field's motion is denied.

But Siwik's Section 301 claims were not timely asserted under the six-month limitations period first announced in *DelCostello.* There is thus no genuine issue of material fact in that respect, and Marshall Field is entitled to a judgment as a matter of law to that extent. Complaint Counts II and III are dismissed with prejudice.

Because one of Siwik's claims must therefore be resolved by a factfinder, this action is set for a status hearing at 9 a.m. on December 13, 1996. At that time counsel should be prepared to discuss the necessary arrangements for, and the scheduling of, the trial of Siwik's ADEA claim.

---

8. Even that time span must be viewed in recognition of the extensive work (and hence extensive time) involved in putting together a summary judgment motion, with its requirements of the detailed GR 12(M) submission as well as what has to be a persuasive memorandum of law.

9. No ultimate view is expressed here as to whether the tougher approach of Rule 8(c) or the more lenient application of Rule 15(a) should prevail in the situation where a defendant is or should be aware of an affirmative defense at the time of answering, but it fails to raise the defense in the answer. That question may await another day.