**Debra BIBBS, Plaintiff,**

v.

**BOARD OF TRUSTEES FOR THE UNIVERSITY OF ILLINOIS,**
**Defendant.**

**No. 97 C 3440.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 7, 1998.

Gerald A. Goldman, Arthur R. Ehrlich, Jonathan C. Goldman, Goldman & Ehrlich, Chicago, IL, for Plaintiff.

Martin Peter Greene, Allen Price Walker, Greene & Letts, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Debra Bibbs sues defendant Board of Trustees for the University of Illinois for race discrimination and failure to promote under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Bibbs alleges that the Defendant discriminated against her because of her race by giving her an unfair evaluation and by involuntarily transferring her to a position with no identified duties or job description. Currently before the Court is the Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## I. BACKGROUND

The following undisputed facts are taken from the parties' Local General Rule 12 statements of material facts and accompanying exhibits.[1]

---

**1.** Local Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no general issue." The movant's statements must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." The Defendant's statement shall be cited herein as "Def.'s Facts." Similarly, Local Rule 12(N)(3) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Bibbs' response shall be cited as "Pl.'s Facts." Local Rule 12(N)(b) authorizes the non-moving party to submit a statement of additional facts that require the denial of summary judgment; pursuant to Local Rule 12(M), the moving party may then submit a response to the non-moving party's additional facts. All properly supported material facts set forth in either party's statement (i.e. Def.'s Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted by the statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Institute,* 31 F.3d 451, 453 (7th Cir. 1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Moreover, the mere denial of a particular fact without specific references to the affidavits, parts of the record, and other supporting materials that allegedly establish a factual dispute is insufficient; and, where a factual assertion is met with such a naked denial the fact may be admitted.

Bibbs' Employment at the University of Illinois Medical Center

Debra Bibbs began working at the University of Illinois ("Medical Center") in 1976 as a Clerk–Typist. (Def.'s Facts ¶ 2). The Defendant promoted Bibbs numerous times during her tenure and on June 6, 1993, the Defendant promoted Bibbs to the position of Health Center Administrator. (Def.'s Facts ¶ 6). Following her promotion, Bibbs reported to Bruce Elegant. Elegant, the Chief Operating Officer of the Medical Center, was also the acting Executive Director of the Medical Center at the time of Bibbs' promotion. (Pl.'s Dep. 10, 11).

On April 4, 1994, the Defendant hired Sidney Mitchell as the Executive Director of the Medical Center. (Def.'s Dep. 6). Elegant resumed his role as Chief Operating Officer, but recommended that Mitchell retain Bibbs as Health Center Administrator. Following Mitchell's appointment, Mitchell interviewed Bibbs and invited her to continue working for him in the same capacity. (Pl.'s Dep. 119–20). Initially, the arrangement appeared to be a good one. In his August 25, 1994 review of Bibbs' performance, Mitchell found Bibbs to be "a true asset to [the Medical Center]" and recommended that she receive a 3.5% merit increase. Mitchell gave Bibbs high marks in the areas of confidentiality, supervision of clerical staff, supervision of supplies, knowledge and use of the computer, and budgeting. While Mitchell commended Bibbs' scheduling and communication skills and her execution of Mitchell's travel arrangements and reimbursement, he noted that Bibbs should "proofread all typed items before giving them to me", "find out more about the content of the meetings and pull anticipated materials from the files", and complete reimbursement paperwork "on a more timely basis."

Unfortunately, the working relationship between Mitchell and Bibbs began to deteriorate. By January of 1995, Mitchell was repeatedly complaining about Bibbs' performance deficiencies. (Pl.Dep.124). These complaints included errors in scheduling meetings, difficulty in locating files, typographical errors, and problems with Mitchell's travel arrangements. (Pl.Dep.124–33). Bibbs denies that she was responsible for any of the problems. (Pl.Dep.128).

**Defendant Hires Linda Chufar As His Administrative Assistant**

In approximately February of 1995, Mitchell hired Linda Chufar as his Administrative Assistant. (Pl.Dep.128). While Chufar held the higher title, Bibbs' salary was slightly higher because of her years of employment with the Medical Center. (Pl.Dep.168). Even though Bibbs didn't apply for the position, Mitchell admits that had considered hiring her. He decided against it, however, because he believe that Bibbs lacked the skills for the position. Specifically, Mitchell stated that Bibb's inability to prioritize, to act independently, and to deal with people compared with Chufar's outstanding recommendations and intimate knowledge of the entire University system tipped the scales in Chufar's favor.

Bibbs was required to work for and report to Chufar. Bibbs concedes that their relationship "wasn't the best," and that the two had several disagreements and communication breakdowns. Pl.'s Dep 146. Bibbs contends that she informed Mitchell that a number of the problems that he accused her of were actually caused by Chufar. Approximately five months after Chufar's appointment, Bibbs asked Mitchell why she was not selected for Chufar's position. (Pl.'s Dep. 140). According to Bibbs, Mitchell responded that he needed an assistant to write speeches, policies, and procedures for him (Pl.'s Dep. 141), and believed that Chufar could perform these duties more effectively than Bibbs. (Def.'s Dep. 79). Bibbs admits that she had never written speeches before. Bibbs further alleges that Mitchell said that "overall he needed a mother."(Pl.'s Dep. 141).

On June 28, 1995, the Associate Vice-Chancellor sent a memo to all Deans, Directors, and Department Heads detailing the fiscal year 1996 open range support staff policy for the University. (Ex. 10). The document explained that the University had received appropriations of 3% for salary increases during fiscal year 1996. Increases beyond that amount would be considered "open range" increases and were to be funded internally. (Ex. 10).

In August 1995, Mitchell reorganized the Medical Center executive staff and eliminat-

ed Bibbs' Health Center Administrator position reporting to Mitchell. (Def. affidavit, Exhibit 12). Bibbs was reassigned as Health Center Administrator to Interim Service Line Administrator Steve Straka effective August 1995. There was no change in pay or civil service status as a result of this change. (Def. Facts para. 32). Following the reassignment, Bibbs was moved and re-moved to temporary work stations. Except for a two-month transitionary period, Bibbs was always on the same floor as her supervisor.

During September 1995, Bibbs received a performance evaluation from Mitchell covering the period of July 1, 1994 through June 30, 1995. (Ex. 6). Bibbs' received an overall rating of 3.0. (Ex. 6). This rating fell into the category of "fulfills expectations," and that category is used for "strong performance." (Ex. 6). Mitchell recommended that Bibbs receive a salary increase of 4%. (Ex. 7). However, Mitchell also provided a detailed statement of Bibbs' secretarial shortcomings, specifically typing, scheduling, filing, and travel arrangements. (Def.'s Facts. Para. 41). Bibbs denied that any of Mitchell's complaints were true. (Pl.'s Dep. 135). Bibbs received a rating in this category of "meets some expectations." (Ex. 6).

On September 22, 1995, Bibbs filed a charge of discrimination with the EEOC and on February 12, 1997, Bibbs received the Right to Sue letter from the U.S. Department of Justice. (Pltf's Answers to Interrogatories, p. 3–4). Bibbs initiated this litigation on or about May 9, 1997, claiming that the defendant violated Title VII. In her amended complaint, Bibbs alleges that she was given unfair performance evaluations and was involuntarily transferred to a position with no identified duties or job description because of her race. Bibbs alleges that the "Defendant has not treated non-black employees in this manner and has constructive demoted Plaintiff." Am. Compl. ¶ 10. Defendant denies these allegations and filed this motion for summary judgment.

## ANALYSIS

### I. *SUMMARY JUDGMENT STANDARDS*

Summary judgment is appropriate only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the evidence in a light most favorable to the non-moving party, *see Cincinnati Ins.,* 40 F.3d at 150, and draw all reasonable inferences in the non-movant's favor. *Kirk v. Federal Property Mgmt. Corp.,* 22 F.3d 135, 138 (7th Cir. 1994). However, if the evidence is merely colorable, is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. 2505; *see also First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact"). Credibility determinations and weighing evidence are jury functions, not those of a judge when ruling upon a motion for summary judgment. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In an employment discrimination suit, where credibility and intent are crucial issues, these standards are applied with added rigor. *See Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994).

### II. *RACIAL DISCRIMINATION*

■ Title VII of the Civil Rights Act of 1964 provides "that it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or natural origin." 42 U.S.C. § 2000e–2(a)(1)(1964). A plaintiff can establish race discrimination under Title VII in one of two ways: (1) by presenting direct evidence that her termination was racially motivated; or (2) by employing the burden-

shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Cowan v. Glenbrook Sec. Services, Inc.,* 123 F.3d 438 (7th Cir.1997). Under either method, a plaintiff must produce sufficient evidence to allow a jury to infer that race was a motivating factor in the defendant's decision. *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1350 (7th Cir.1995). In the instant case, Bibbs contends that she has presented indirect evidence under the *McDonnell Douglas* approach sufficient to defeat the Defendant's motion for summary judgment.

To succeed on a Title VII racial discrimination claim under the indirect method, the plaintiff must first establish a prima facie case to create a rebuttable presumption of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To state a prima facie case of racial discrimination under *McDonnell Douglas,* Bibbs must demonstrate that: (1) she is within a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she has evidence from which it can be inferred that the adverse action sprang from a "legally forbidden ground," for example, more favorable treatment of similarly situated white employees. *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158–59 (7th Cir.1996).

If the plaintiff demonstrates a prima facie case, then the burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer is successful, the presumption dissolves and the burden of production shifts back to the employee to prove that the employer's proffered reasons were not the employer's true reasons, but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Pretext may be shown by establishing one of the following: (1) the defendant's explanation had no basis in fact; (2) the explanation was not the "real" reason, or (3) the reason stated was insufficient to warrant the adverse employment action. *Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir.1994). The plaintiff always retains the ultimate burden of showing that the she was the victim of intentional discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

### 1. Unfair Performance Evaluation And Marginal Pay Increase

The Defendant first argues that Bibbs cannot establish a prima facie case of race discrimination under McDonnell Douglas. The Defendant primarily contends that Bibbs fails to satisfy the third prong of the McDonnel Douglas test because Bibbs' evaluation was generally positive and she received a fair pay increase. Further, even if we were to find that Bibbs could establish a prima facie case, the Defendant argues that Bibbs cannot prove that the reason for the transfer was a mere pretext for race discrimination. We will proceed directly to examine whether the Defendant has articulated a legitimate reason for Bibbs' evaluation and merit increase, and whether Bibbs has adduced sufficient evidence to raise a triable issue as to pretext. *See E.E.O.C. v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149–150 (7th Cir.1996) (noting that a "court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case" and "to expedite the process it may be preferable to get past the prima facie case and examine the pertinent issue of whether there was discrimination in a job action.").

The Defendant contends that Bibbs' evaluation and merit increase properly reflected her performance. Out of a possible 4.0 points, Mitchell rated Bibbs' performance a 3.0, barely satisfying the "Fulfills Expectations" rating (2.9 to 3.59). While Bibbs received a 3.0 or 4.0 out of a possible 4.0 in the categories of Interpersonal Communications, Teamwork, Self–Management, and Cost Containment, she rated only a 2.0 in the category of Secretarial Responsibilities. In discussing Bibbs' performance of her typing, scheduling, and travel duties, Mitchell wrote that:

> In many instances these responsibilities were met, but frequently they were not.

Often there were typing errors; most memos/letters were typed 2–3 times. Often things would not get typed for several days. Scheduling was a problem. At least 2 times/wk [sic] I would be scheduled for a meeting at a wrong location or not scheduled at all. Travel was a major problem. Seldom did I go to a meeting in wh [sic] one of the following did not occur: not registered, registration not paid, wrong hotel, flight tickets not until the last minute. It often took 2+ weeks for my reimbursement papers to be submitted, after I had turned in receipts.

Def.'s Ex. 6. Many of these deficiencies reflect concerns that Mitchell raised in Bibbs' 1994 evaluation, particularly his admonishment to proofread documents prior to submission, and to improve the time for reimbursement.

Bibbs also received a 4% merit pay increase in 1995, a more substantial raise than her 3.5% 1994 pay increase. Notably, the increase exceeded the recommended raise for "average" performance. In a June 28, 1995 memo, the Associate Vice–Chancellor advised that the University received State appropriations of 3% for salary increases during the 1996 fiscal year, and recommended a 3% pay increase for average performance. Any recommended raise that exceeded 5% required a letter of justification. Therefore, the Defendant argues, the evidence establishes that the raise was perfectly in keeping with Bibbs performance, past increases, and University guidelines.

Arguing that the Defendant's explanation for her mediocre evaluation and raise are pretextual, Bibbs contends that she never made any errors while working for Mitchell, that the errors were caused by either Mitchell, Chufar, or other employees, and that Mitchell knew that this was the case. In support of this contention, Bibbs attaches to her response a draft of a letter that Mitchell directed her to correct. The letter reveals no typographical errors, only Mitchell's sub-

stantive changes. In addition, Bibbs frequently informed Mitchell that the complained of errors were not her fault.[2]

Drawing every inference in Bibbs' favor, her evidence shows, at best, that her evaluation was unfair. However, this is insufficient to establish pretext. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) ("the issue of pretext does not address the correctness or desirability of reason offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.") Bibbs has failed to demonstrate that Mitchell did not honestly believe that Bibbs was performing poorly during the time period covered by her evaluation. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 891 (7th Cir.1997); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir.1992) (if the defendant honestly believed that the employee was not meeting legitimate expectations, termination is justified).

Bibbs' disagreement with the accuracy of Mitchell's perception of her performance does not cast doubt upon his honesty. *Gustovich v. AT & T Communications*, 972 F.2d 845, 848 (7th Cir.1992) (the question is not whether the employer's reasons for a decision are right, but whether the employer's description of its reasons is honest). Her presentation of evidence that one letter resubmitted for editing did not contain typographical errors, and her allegations that Mitchell and Chufar were sometimes the cause of the problems does not address the numerous instances of error that Mitchell assigned to Bibbs. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir.1991) (employee "must do more than challenge the judgment of his superiors through his own self-interested assertions.") More importantly, Bibbs does not allege that Mitchell fabricated or could not have reasonably believed that Bibbs was the source of the errors, but rather that he unfairly

---

**2.** For example, when Mitchell complained that Bibbs sent him to the wrong room for one meeting, Bibbs pointed out that the card she gave him noted the correct room. Bibbs also contends that if a file was missing, it was always Mitchell who had misplaced it. Bibbs contends that Chufar's incomplete instructions often led to errors, that she would call this to Mitchell's attention, but Mitchell would not chastise Chufar. Finally, Bibbs points to instances of scheduling problems that occurred while she was on vacation, and concludes, therefore, that they must have been someone else's fault.

blamed her for them. *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir.1987) ("a reason honestly believed but poorly founded is not a pretext").

Accordingly, we find that the defendant has justified its assessment of Bibbs' 1995 performance and raise. While Bibbs disagrees with Mitchell's perception of her performance, her disagreement is insufficient to establish pretext. Therefore, Bibbs' contention that her 1995 evaluation and pay increase constituted race discrimination under Title VII are without merit.

### 2. Involuntary Transfer to Position Without A Job Description.

■ Next, Bibbs alleges that the Defendant improperly and abruptly transferred her to a position in another department without a job description. The Defendant offers two alternate grounds in support of its motion for summary judgment on Bibbs' involuntary transfer claim. First, the Defendant argues that the transfer was not an adverse job action. The Defendant notes that Bibbs suffered no loss in salary and her job title remained the same. (Def's Facts ¶ 32). Bibbs contends that while her title may have remained the same, her duties diminished substantially. While her position reporting to Mitchell required Bibbs to supervise other employees and be involved with the budget, following her transfer she was given only copying and mailing assignments.

■ An adverse employment action has been broadly defined in the Seventh Circuit. *See Collins v. State of IL*, 830 F.2d 692, 703 (7th Cir.1987) (finding that the plaintiff suffered an adverse job action when her office was taken away from her, she was placed in a new department where her supervisors didn't know what her job encompassed, she was assigned to a desk outside her supervisor's office where the receptionist would sit, and she lost her phone, business cards, and listing in professional directories and publications). However, an employee does not establish a prima facie case by showing only that a job transfer would cause personal inconvenience or altered job responsibilities. *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993) (a change in title from assistant vice-president and manager of one branch of a bank to a

loan officer position at a different branch did not by itself constitute an adverse employment action). Further, a lateral transfer involving a title change and reporting to a former subordinate does not constitute a materially adverse employment action despite a "bruised ego" or "professional humiliation." *Flaherty v. Gas Research Institute*, 31 F.3d 451, 457 (7th Cir.1994).

Drawing all reasonable inferences in Bibbs' favor, we find that she has presented evidence of more than a mere "bruised ego". Bibbs' unrebutted allegations that her duties were substantially diminished are sufficient to raise a material issue of fact as to whether her transfer constituted an adverse job action. This does not save the day for Bibbs, however, as the Defendant has offered an alternative basis for granting summary judgment on this claim. The Defendant argues that it had a legitimate, non-prextual reason for transferring Bibbs. Because we agree with the Defendant's second contention, we find that summary judgment is appropriate.

Mitchell contends that the Defendant expected him to implement changes in the operation of the hospital after his appointment as Executive Director, including reorganizing the executive staff and adjusting reporting responsibilities. Shortly after Mitchell took office, Mitchell developed, with Bibbs' assistance, job descriptions for an Information Services Supervisor and an Administrative Assistant to the Executive Director. Mitchell was creating these positions to replace the Health Center Administrator to the Executive Director position. The Information Services Supervisor position was a significantly lower grade position than Health Center Administrator to the Executive Director, but the Administrative Assistant position was a slightly higher grade. In her deposition, Bibbs acknowledged that she was performing many of the duties listed under each category.

In February of 1995, Mitchell hired Chufar to fill the Administrative Assistant position. Then, in August 1995, Mitchell formally eliminated Bibbs' Health Center Administrator reporting to the Executive Director position, reassigning Bibbs as the Health Center Administrator reporting to the Interim Service

Line Administrator for Oncology, Steve Strayka. Bibbs contends that her responsibilities after the transfer are largely undefined but clearly diminished.

Bibbs does not contend, however, that Mitchell's reorganization plan had no basis in fact. Rather, Bibbs insists that she should have received the Administrative Assistant position. While Bibbs' complaint is devoid of any reference to the Administrative Assistant position or a failure to promote contention, both parties' arguments have addressed Bibbs' involuntary transfer claim in conjunction with Mitchell's selection of Chufar over Bibbs. Accordingly, we will address this contention as well.[3]

Mitchell envisioned the Administrative Assistant to the Executive Director performing a more expanded role than that previously undertaken by Bibbs. Mitchell sought an assistant who could assist him in writing speeches, organize social events, chair the policy and procedure committee, and work independently. Mitchell claims that he hired Linda Chufar for the Administrative Assistant position because Chufar had outstanding recommendations, she was organized, and she understood the bureaucracy of the University. Chufar worked at the University of Illinois at Chicago as the Director of Auxiliary Services employment for approximately 10 years. She had a knowledge of "how things moved throughout the state system, the bureaucracy of the university." Mitchell Dep. at 80. Chufar was responsible for implementing and overseeing a number of University and student affairs projects for all campuses. In addition to her University experience, Chufar also worked for Primary Care Consultants in which she helped to provide services to ambulatory health care centers. (Def.Ex. 15).

Conversely, Mitchell had concerns about Bibbs' ability to handle the new position. He did not believe that Bibbs possessed or demonstrated the degree of leadership that the Administrative Assistant position demanded. While Chufar had knowledge of the State and University systems, Bibbs' experience was confined to the Medical Center. In addition, Mitchell doubted Bibbs' organizational abilities based upon her currently deficient typing, scheduling, and travel arrangement skills.

In response, Bibbs alleges that the reasons for selecting Chufar over Bibbs are not credible. Bibbs claims that Chufar did not write speeches for Mitchell, she only prepared general outlines. Bibbs also points to Chufar's lack of experience with the Medical Center, and argues that "it would be more logical to select someone like plaintiff who had more experience with the UIC Medical Center." Finally, Bibbs asserts that if the defendant believes that her 1995 evaluation "was so good that it could not possibly constitute an adverse action," then her poor performance could not have been the basis of Mitchell's decision not to hire her. In doing so, Bibbs again challenges Mitchell's assessment of her performance.

We find that none of Bibbs' assertions casts any doubt upon the legitimacy of Mitchell's explanation as to why he hired Chufar for the Administrative Assistant position. As with her evaluation and merit increase charge, Bibbs' attacks are limited to her disagreement with Mitchell's priorities and assessment of the candidates' abilities. See *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir.1989) (concluding that an employer can set whatever performance standards he wants). However, such attacks are not sufficient to withstand a summary judgment motion. *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir.1995) (finding no pretext where plaintiff failed to demonstrate that the promoted employee had demonstrated a "mechanical aptitude, and got along well with other workers," strengths that the plaintiff lacked.). "A reason honestly be-

---

3. It is undisputed that Bibbs did not apply for the Administrative Assistant position, even though she "was hoping [she] would be doing the assistant duties," Pl.'s Dep. at 144, and the position was posted as available. Mitchell Dep. at 81. This alone may be fatal to her ability to establish a prima facie case for failure to promote, although neither party raises this point. Accord-

ingly, we will treat Bibbs' contention that she should have received the position as evidence of pretext that is, while the defendant's reorganization plan was genuine, its decision to remove her from the Executive Director's staff and to hire a new assistant who was white reveals that the transfer was actually motivated by racial animus.

lieved but poorly founded is not a pretext." *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.1987). We remind Bibbs that this Court does not

> sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the federal antidiscrimination laws do] not interfere. .Rather, [the] inquiry is limited to whether the employer gave an honest explanation for its behavior.

*McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992). Having determined that Bibbs has failed to demonstrate that Mitchell's reason for hiring Chufar and transferring Bibbs were pretextual, Defendant's motion for summary judgment on Bibbs' involuntary transfer claim is granted.[4]

### 3. Failure to Promote to Gift Shop Manager or Interim Director for Volunteer Services

 Finally, Bibbs argues that she was discriminated against because she was not assigned to the Gift Shop Manager position or the Director of Volunteer Services position. (Pl.'s Aff. ¶ 14). Bibbs claims that the Defendant has repeatedly filled these positions with white employees. (Pl.'s Ex. 3). Bibbs alleges that she would not have had to suffer a pay cut even though Catherine Troyner, the current Gift Shop Manager, and Margaret Reynolds, who occupied Volunteer Service position before its functions were consolidated into a higher position, both earned less than Bibbs, because she had more seniority than Troyner or Reynolds. (Def.'s Facts. ¶¶ 51, 52).

 In examining Bibbs' claim, we note that the prima facie case for a failure to promote based upon racial discrimination differs slightly from the typical racial discrimination claim. In a failure to promote case, a claimant must show that (1) she is a member of a protected group; (2) she applied for and was qualified for the position sought; (3) the employer rejected her for the position sought; and (4) the employer granted the promotion to a person whose race was different than the plaintiff's, but whose qualifications were similar or lesser than the plaintiff's. *Von Zuckerstein v. Argonne Nat'l Laboratory,* 984 F.2d 1467, 1472–73 (7th Cir.), *cert. denied,* 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993).

However, Bibbs' amended complaint contains no allegation about the Defendant's failure to promote her to either of these positions as a basis for her Title VII claim. In addition, it is undisputed that Bibbs did not apply for either of these positions. As such, we would expect that the Plaintiff would explain how the Defendant could have rejected her for these positions, but she does not attempt to do so. Moreover, Bibbs offers no evidence that the employees selected for each position were similarly or less qualified than she was, beyond her assertion that she was more senior than the selected employees. In short, Bibbs makes no attempt to establish a prima facie case.[5] Accordingly, this claim cannot serve as the basis for her Title VII action. The Defendant's motion for summary judgment is granted in its entirety.

### CONCLUSION

The evidence demonstrates that Debra Bibbs was an exemplary employee for the Defendant for years. Despite their differences, even Sidney Mitchell was grateful for Bibbs' dedication to him and the Medical Center. However, it is undeniable that Mitchell found critical aspects of Bibbs' performance to be lacking. Moreover, there is not a scintilla of evidence that Mitchell's assessment of Bibbs' abilities and transfer of

---

4. Moreover, Mitchell interviewed and subsequently permitted Bibbs to stay on as the Health Center Administrator working for him. (Pl.'s Dep. 119–120). The Seventh Circuit has held that when the same decision maker that hired or allowed a plaintiff to continue work is alleged to be the discriminator, an inference of non-discrimination arises. *EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 148 (7th Cir.1996) (noting that the plaintiff failed to pres-

ent evidence sufficient to overcome the inference of nondiscrimination because a person who intends to discriminate against minorities is unlikely to hire them or let them stay on working in the first place).

5. The Court is baffled by the Defendant's decision to address a claim not raised in the complaint or properly briefed by the plaintiff.

Bibbs was based upon any racial animus toward her. Because the undisputed evidence would not allow a reasonable jury to return a verdict in support of Bibbs' Title VII claim of racial discrimination, we must grant the Defendant's motion for summary judgment. The Clerk of the Court is directed to enter judgment, pursuant to Fed. R.Civ.P. 58 in favor of the Defendant and against the Plaintiff.